UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RHONDA CORSON,

    Plaintiff,

      v.

MODULA, INC. and MODULA, SpA

    Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Rhonda Corson ("Ms. Corson"), by and through undersigned counsel, and complains against the Defendant as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the MHRA; Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*.

2.      Ms. Corson is a United States citizen residing in the Town of Winthrop, County of Kennebec, State of Maine.

3.      Modula, Inc. ("Modula") is a Maine business corporation that manufactures automated storage and retrieval units. It does business in Europe as Modula SpS.

4.      Modula has about 250 employees at three locations including a plant in Lewiston, Maine and two plants in Italy.

5.      The Defendant had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

6.      This Court has subject matter jurisdiction over Ms. Corson's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

7.      On or about May 20, 2019, Ms. Corson filed a timely Complaint/Charge of Discrimination against Defendant alleging unlawful age discrimination, sex discrimination, retaliation, and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

8.      On or about January 8, 2020, the MHRC issued a Notice of Right to Sue with respect to Ms. Corson's state law claims.

9.      On or about January 13, 2020 the EEOC issued a Notice of Right to Sue with respect to Ms. Corson's federal law claims.

10.     Ms. Corson has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

<u>JURY TRIAL REQUESTED</u>

11.     Ms. Corson requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

12.     Ms. Corson is female. She was born in 1969.

13.     In 2017, Ms. Corson moved from Pennsylvania to Maine to take the position of Human Resources Manager with Modula in Lewiston, Maine.

14.     Ms. Corson's start date was May 30, 2017.

15.     Ms. Corson's job performance as Human Resources Manager was exemplary.

16.     Ms. Corson's starting pay was $80,000 per year. She received a 10% pay increase in December 2017 to $88,000 per year. She received a 3% pay increase in December 2018, bringing her annual salary to $90,640. She received a $5,000 performance-based bonus when her employment ended in February 2019.

17.     Ms. Corson was a team player who energetically supported the growth of Modula.

18.     Ms. Corson created a training course for manufacturing techs with the assistance of a local technical institute.

19.     Ms. Corson expanded and improved the quality of the network of staffing agencies that partnered with Modula to fill vacancies.

20.     When Ms. Corson started with Modula, there was a great deal of dissatisfaction with the quality of temporary employees recruited by the former Human Resources Manager. Ms. Corson rectified this by adding agencies to the network and removing some agencies with a history of problems.

21.     Ms. Corson forged relationships with the Career Centers, the Lewiston-Auburn Chamber of Commerce, and many other organizations.

22.     When Ms. Corson arrived at Modula, she immediately reviewed the 401k plan and the service provided by the current provider and found them lacking.  She had two other companies come in to present their solutions.  On Ms. Corson's advice, Modula switched to a provider that focuses on manufacturing businesses and had a robust educational component for employees. The fees were much reduced and ended up saving Modula money.

23.     During Ms. Corson's tenure, she worked with the existing employee health insurance broker and reviewed the employee health insurance plan. She was very dissatisfied

with the service Modula was receiving and the process used by the broker to shop for their renewal.

24.     Modula had had a very bad claim year and Ms. Corson did not feel the broker did their due diligence to get Modula the best deal and they ended up with a 35% increase in premium.

25.     After that initial open enrollment in October 2017, Ms. Corson immediately began the search for a new broker.  She helped Modula transition to a new broker, enhanced the benefit offerings and had a very successful open enrollment for the 2018-2019 benefit year.

26.     At one point, Ms. Corson was called into a meeting with Antonio Pagano, CEO and Stephen Miller, Finance Director. They questioned her about a five to seven percent increase in premium which Ms. Corson had negotiated and worried that it would cause a mass exodus of employees.  (Past increases had been in the 15-35% area.) Ms. Corson reassured them that her decision was sound and she was right; there was no mass exodus.

27.      Ms. Corson moved Modula to a model of using a Benefits Fair instead of an enrollment meeting.  She received very positive feedback from employees and management for the success of the fair.

28.     Ms. Corson also discovered that the current Employee Assistance Program (EAP), for which Modula paid a high fee, was not being utilized at all.  Ms. Corson moved the company to a more conventional EAP and provided education and outreach to employees and thereafter, many employees made use of the benefit.

29.      There were many instances where Modula employees needed assistance navigating their benefits.

30.     Ms. Corson feels very strongly that the mission of HR should be to help make it easier for employees to be at work.

31.     For her, helping employees access and understand their benefits is a huge part of making it easier for employees to be at work.

32.     Employees were appreciative and grateful for Ms. Corson's help.

33.     This is a non-solicited reference from an employee who is still employed at Modula. He wrote this on LinkedIn after learning that Ms. Corson left Modula. (People were told she resigned.)

> "I had a pleasure of working with Rhonda for almost two years at the Modula Inc., collaborating in revamping of Customer Service Dept. I was particularly impressed by Rhonda's ability in teambuilding and to deal with people of different culture in a global environment. Any employee would be lucky to have Rhonda as a manager."
>
> Massimiliano Fiorelli, CLTD
> Digital Transformation | Omnichannel Retail | Supply Chain 4.0

34.     Joseph Giampetro is the Project Manager, Special Projects, for Modula.

35.     At first, Ms. Corson had a friendly relationship with Mr. Giampetro, even though his behavior was aberrant.

36.     Ms. Corson offered Mr. Giampetro friendly, professional advice as a colleague and, she thought, as a friend.

37.     Mr. Giampetro took offense to Ms. Corson's feedback. He started to treat her as "the enemy" and made efforts to sabotage her efforts.

38.     For her part, Ms. Corson did her best to have as little contact as necessary with Mr. Giampetro as he treated her with such disdain and hostility.

39.     In about October 2017, Ms. Corson started receiving complaints from employees about Mr. Giampetro's mistreatment.

40.     In the spring of 2018, she had discussions about Mr. Giampetro's misconduct with the Factory Manager, Nathaniel Picard, who told Ms. Corson that several of his employees felt threatened or embarrassed about Mr. Giampetro's behavior.

41.     Mr. Picard told Ms. Corson that Mr. Giampetro had threatened employees with firearms.

42.     Mr. Picard told Ms. Corson about an incident where Mr. Giampetro intimidated him by removing a gun from his glove compartment while Mr. Picard was in the passenger seat – making sure that Mr. Picard saw him doing it - when they went out to lunch at a restaurant in Lewiston.

43.     Mr. Picard reported that Mr. Giampetro made numerous lewd comments about women and treated women in the workplace with disrespect.

44.     For example, Mr. Picard reported that Mr. Giampetro said, "What do you think of that," after the Controller Tatiana Tsay walked by, and then said, "You think she's attractive? Her husband looks like such a dork and gets to curl up next to that…"

45.     Mr. Picard also reported that Mr. Giampetro said, about his own ailing wife, that he regretted marrying her and that it would have been cheaper to "every few weeks go get some expensive high-quality poon-tang."

46.     Mr. Picard also reported to that Mr. Giampetro referred to men he perceived as being weak as "pussies."

47.     Mr. Picard also complained about Mr. Giampetro's racist conduct.

48.     For example, when an African-American employee was terminated for consuming edible marijuana, Mr. Giampetro exclaimed, "We got the Rastafarian."

49.     When an African-American temp was hired, Mr. Giampetro commented, "the reason you [Mr. Picard] and Rhonda like him is because he's black."

50.     Mr. Picard reported that Mr. Giampetro was biased against African-Americans and new Americans from sub-Saharan Africa and suspicious of their abilities and work ethic.

51.     Mr. Picard put his concerns about Mr. Giampetro in an email to Ms. Corson on June 7, 2019.

52.     Ms. Corson had reasonable cause to believe that Mr. Giampetro's conduct with regard to women and people of color constituted unlawful sexual and racial harassment and discrimination.

53.     Ms. Corson had reasonable cause to believe that Mr. Giampetro's threatening behavior was unlawful and a threat to the safety of the employees.

54.     Ms. Corson felt personally threatened by Mr. Giampetro because his behavior was erratic and he often spoke of his "arsenal" and how he would "take care of" his own.

55.     Ms. Corson had many conversations with Modula CEO Antonio Pagano about Mr. Giampetro.

56.     Ms. Corson was emphatic about what a serious threat Mr. Giampetro posed to Modula's employees.

57.     Ms. Corson spoke up to Mr. Pagano about her concerns regarding Mr. Giampetro to address and eliminate what she believed to be unlawful sexual and racial harassment in the workplace and threats to employee safety.

58.     Ms. Corson advised Mr. Pagano to get advice from outside counsel about investigating and addressing the complaints of sexual and racial harassment and threatening conduct by Mr. Giampetro.

59.     Ms. Corson spoke to Mr. Pagano and advocated for firing Mr. Giampetro and hiring a replacement.

60.     Ms. Corson's motivation for having Mr. Giampetro investigated and for strongly recommending a severe sanction was to protect employees from being sexually harassed and threatened at work and to address this danger to employees' safety.

61.     Mr. Pagano did not agree that Mr. Giampetro's conduct was bad enough to warrant termination.

62.     Mr. Pagano said that none of the allegations against Mr. Giampetro were true.

63.     Mr. Pagano stated that he did not believe that Mr. Giampetro had violated Modula's policies or violated the law.

64.     Mr. Pagano denied that Mr. Giampetro's lewd comments and disrespect for women and minorities in the workplace was a problem.

65.     Mr. Pagano commented, "I like Joe."

66.     On about July 25, 2019, Mr. Pagano issued a final warning to Mr. Giampetro for "disrespectful behavior" and "poor judgment."

67.     Mr. Pagano stated that he disagreed with any discipline and that he was just doing what the law was making him do.

68.     The warning said that Mr. Giampetro would be transitioned out of the company when a replacement could be recruited.

69.     Although Mr. Giampetro was warned that any further unprofessional conduct could result in termination, Mr. Giampetro continued to harass Mr. Picard and others and faced no consequences.

8

70.     Employees who came to Ms. Corson with complaints about Mr. Giampetro asked that they not be identified. The reason they gave for not being identified is that they saw that Mr. Giampetro did not suffer any serious discipline for harassment and intimidation and that they were afraid for their jobs.

71.     On information and belief, Mr. Picard did not become the Director of Manufacturing because of Mr. Giampetro.

72.     When Mr. Picard was hired, Acting CEO Massimiliano Gigli told him that his career path was to become the Director of Manufacturing when Mr. Giampetro retired.

73.     After Mr. Picard complained about Mr. Giampetro's racism, sexism, and intimidation, Ms. Corson and other employees witnessed Mr. Pagano treat Mr. Picard with hostility and disrespect.

74.     Even after Mr. Giampetro left, the relationship between Mr. Pagano and Mr. Picard never recovered. Mr. Pagano told Mr. Picard that he would never become the Director of Manufacturing, regardless of his performance. As a result, Mr. Picard left his job on March 1, 2019.

75.     On January 4, 2019, Mr. Giampetro was ultimately separated from employment.

76.     Mr. Pagano allowed Mr. Giampetro to dictate the terms of his separation so it appeared he was retiring.

77.     Mr. Giampetro was recognized for his years of service at the company Christmas party.

78.     Ms. Corson was present when Mr. Giampetro's separation plan was created.

79.     Mr. Pagano did not want to fire Mr. Giampetro but did not have a choice because Ms. Corson had pressed to include outside counsel in the handling of Mr. Giampetro's employment.

80.     Mr. Pagano allowed Mr. Giampetro to retire with a sizable severance package including performance-based bonuses.

81.     There was a marked difference in how Mr. Pagano treated Ms. Corson after she complained about Mr. Giampetro and advocated that he be fired.

82.     During a team building event in November 2018, prior to Mr. Giampetro's separation, Mr. Pagano called Ms. Corson out in front of other members of the leadership team for continuing to bring complaints against Mr. Giampetro.

83.     Ms. Corson said that Mr. Giampetro's behavior warranted continuing complaints but Mr. Pagano dismissed her concerns.

84.     Ms. Corson received her annual review/performance evaluation for 2018 on December 18, 2018. Mr. Pagano gave Ms. Corson a 3% raise in contrast to the previous year's 10% raise. Mr. Pagano rated Ms. Corson as needing improvement in "use of tools and/or technology, improve the 'accounting' side of HR, and be less 'emotional' in the job environment."

85.     Upon information and belief, the comment about Ms. Corson being too "emotional" was a reference to her pushing hard to have Mr. Giampetro fired for his illegal conduct including unlawful sexual and racial harassment.

86.     The statement about Ms. Corson being too "emotional" reflected a sexist bias on the part of Mr. Pagano rather than an objective observation regarding her job performance.

87.     The criticism and ratings by Mr. Pagano in the December 18, 2018 review were unfounded.

88.     On January 9, 2019, Ms. Corson heard a rumor that someone locally was going to be hired to replace her.

89.     Ms. Corson asked Mr. Pagano about the rumor. He said it wasn't true but that he was considering it. He told Ms. Corson that he did not like the way she handled "the Joe thing" and that she "shouldn't have pushed it."

90.     At the end of the conversation, Ms. Corson asked about the status of her employment. Mr. Pagano stated that he was no longer looking for a replacement because Ms. Corson "knew what she needed to do to keep her job." Mr. Pagano did not explain what he meant by that.

91.     Mr. Pagano continued to retaliate against Ms. Corson.

92.     Mr. Pagano repeatedly told Ms. Corson, "We're not friends."

93.     Mr. Pagano admonished Ms. Corson for unfair reasons.

94.     When Mr. Pagano was not openly hostile or picking on Ms. Corson, he simply ignored her.

95.     On February 28, 2019, Mr. Pagano fired Ms. Corson.

96.     Upon information and belief, Mr. Gigli, the International Sales Director for Modula, SpA, was also involved in the decision to terminate Ms. Corson's employment.

97.     Mr. Pagano came to Ms. Corson's office and asked if she had five minutes. She followed him to his office.  There were no other staff members present.

98.     Mr. Pagano's first words were, "This is not good," and he handed her a termination letter.

99.     Mr. Pagano and Ms. Corson had a 10 to 15-minute long discussion about why she was being terminated.

100.     Mr. Pagano told Ms. Corson she was "not the right person" for the job and that he did not have to tell her why he was firing her.

101.     Ms. Corson pressed Mr. Pagano for a reason.

102.     Mr. Pagano told Ms. Corson that she pushed too hard about the "Joe situation" and that he did not like her pushing to have outside counsel investigate.

103.     Mr. Pagano laughed and said that he was not worried about firing Ms. Corson because she did not have enough money to sue for wrongful termination.

104.     Ms. Corson asked Mr. Pagano if there was anything she could do to keep her job. Mr. Pagano replied, "No."

105.     Once Ms. Corson determined that there was no way she was keeping her job, she asked about a severance package. Mr. Pagano offered her two months' pay.  Ms. Corson stated that she needed six months. Mr. Pagano offered four. Ms. Corson insisted that she needed six.

106.     Mr. Pagano called Mr. Miller into his office to see if the cash flow would allow that large of a payout.  Mr. Miller stated it would not be a problem.

107.     Ms. Corson then stated that she wanted her entire $5,000 performance bonus. Mr. Pagano agreed to her request.

108.     Ms. Corson was given a very generous severance package for someone who was allegedly not doing her job and terminated for valid reasons.

109.     Mr. Pagano treated Ms. Corson differently and with less respect than younger male managers.

110.    For example, the purchasing manager, Brian London, was constantly running out of things and his mistakes would often slow or even stop production entirely. When Mr. London ran out of sheet steel, employees were specifically told not to blame anyone even though it was clearly Mr. London's fault. There were never any consequences for Mr. London's mistakes.

111.    Another example is that Mr. Pagano gave Finance Director Stephen Miller a $10,000 raise in 2018. No one else was given more than cost of living or a small merit bump. Ms. Corson told Mr. Pagano that she thought the finance director was taking advantage of him. He stated he knew that, but he liked Mr. Miller, so he was giving him the raise.

112.    Ms. Corson's replacement, Kevin M. Moss, was hired before she was fired.

113.    Mr. Moss relocated from Atlanta, GA and started working on Tuesday, March 5, 2019, during the week after Ms. Corson was fired.

114.    Mr. Moss was a 33-year-old male. Ms. Corson was a 49-year-old female.

115.    Mr. Moss has about 9 years of experience as an HR professional. Ms. Corson has 20 years of experience in management, HR, and employee relations.

116.    Modula provided reasons for Ms. Corson's termination in a letter dated March 28, 2019 ("Letter") and in response to Ms. Corson's Complaint/Charge of Discrimination ("MHRC").

117.    (Letter) Ms. Corson's financial and technical skills did not meet company expectations nor did she show improvement. (MHRC) Could not create an Excel file.

   a.    Ms. Corson's skills were fine. Just a few months before she was fired, Mr. Pagano made a statement to the management team that if anyone needed any additional skills, he would pay for additional training, not let any of them go.

      b.      Ms. Corson is not an Excel expert (as that is normally not required for a Human Resources Manager) but she was proficient at creating and using Excel files. Ms. Corson was looking into Excel training to improve her skill with spreadsheets.

118.      (MHRC) Ms. Corson was unable to handle payroll.

      a.      Not true. Ms. Corson was responsible for the implementation of Paylocity at Modula, moving the company from ADP. She was completely familiar with the payroll processes.

      b.      HR Generalist Sara Daigle, did the actual payroll work. Any incorrect reports would have come from her.

      c.      Ms. Corson was never made aware of any issues with Ms. Daigle's work.

119.      (MHRC) The finance department complained that Ms. Corson provided incorrect commission numbers.

      a.      Commissions were handled by Ms. Tsay, not Ms. Corson.

120.      (MHRC) Ms. Corson failed to take ownership and responsibility for payroll and commissions.

      a.      After Ms. Corson's December 2018 performance review, Ms. Corson spoke to the controller Ms. Tsay about taking over all payroll and commission activity. Ms. Tsay seemed uncomfortable and said that Mr. Pagano had instructed her not to discuss it with Ms. Corson. Ms. Corson immediately emailed Mr. Pagano, who was out of the office, and asked for a meeting to discuss the

transmission of payroll and commission to HR. He did not make time to meet with Ms. Corson.

121.    (MHRC) Ms. Corson had arguments with employees in other departments, did not handle disagreements from others well, did not consider employee input, would abruptly end conversations or ask an employee to leave her office, did not maintain a professional demeanor.

      a.    These allegations are false. Ms. Corson had great relationships with co-workers and employees. Many employees said she was their "favorite HR lady ever."

      b.    In Ms. Corson's December 2018 performance review, Mr. Pagano rated Ms. Corson's strengths as "very employee oriented, proactive, good mentor."

      c.    No complaints from other departments were ever brought to Ms. Corson's attention.

122.    (MHRC) Ms. Corson was the victim of two phishing schemes and did not tell Mr. Pagano about it.

      a.    Ms. Corson admits that, regretfully, she fell for the first scheme.

      b.    The second scheme was unsuccessful and the gift card was not purchased as Modula seems to imply.

      c.    Ms. Corson told Mr. Pagano about both incidents.

      d.    These mistakes do not justify terminating a good employee like Ms. Corson.

123.    (Letter) The company lost confidence in Ms. Corson because she used her company email account and the company's Indeed account to apply for jobs between September 2018 and January 2019.

      a.      Ms. Corson did not use the company Indeed account for personal reasons.

      b.      Ms. Corson did use her company email to look for another job.

      c.      Mr. Pagano was so hostile toward Ms. Corson after she spoke up about Mr. Giampetro that she was in fear of losing her job.

      d.      Ms. Corson was right to be fearful.

      e.      Upon information and belief, other employees use their company email for personal reasons.

124.    Defendant provided other information to the Maine Human Rights Commission that was untrue.

125.    For example, Modula does not have 16 managers over the age of 40 as alleged in its response to the Commission (There are fewer than 16 managers in total.)

126.    Ms. Corson was not obsessed with Mr. Pagano's age and qualifications. Mr. Fabra, the CEO who hired Ms. Corson, reached out to her when it was announced that Mr. Pagano was getting the position of CEO. Mr. Fabra told Ms. Corson that Mr. Pagano was very young and had no experience, that he was a good person, but he would need her help and guidance. Ms. Corson attempted to provide this requested help and assistance.

127.    Almost every member of the management team (including Mr. Giampetro when he was still friendly with Ms. Corson) came to Ms. Corson and asked her to intercede with Mr. Pagano due to his inexperience and poor decision making.

128.    One of Mr. Pagano's Italian colleagues asked Ms. Corson to attend a meeting with him and Mr. Pagano because the colleague felt that the only way he would be treated professionally and taken seriously was if Ms. Corson attended.

129.    When two members of middle management left and Ms. Corson performed their exit interviews, they both listed example after example of Mr. Pagano's failed leadership.

130.    Ms. Corson would try to talk to Mr. Pagano about these issues. He was not receptive to her advice or input.

131.    Giuseppe Gavoli was brought in as a consultant to assist Mr. Pagano. Ms. Corson had a conversation with Mr. Gavoli, relating to him the concerns of the entire management team. Mr. Gavoli agreed with their concerns and said he shared them but could do nothing as Mr. Pagano was not receptive to his input either.

132.    Ms. Corson wrote, "I f***ing hate Joe," in an email to her assistant, Ms. Daigle, out of frustration with Mr. Giampetro's ongoing disrespect.

133.    Even at the time of his departure from Modula, Mr. Giampetro was undermining Ms. Corson by sending a complaint concerning his final paycheck to Mr. Pagano and Mr. Miller. (Mr. Miller had nothing to do with Mr. Giampetro's final pay but was his ally, which is why Mr. Giampetro addressed the email to him and Mr. Pagano and not Ms. Corson.) Ms. Corson had already explained to Mr. Giampetro the laws that affected his severance pay and 401k contributions.  He didn't believe her so he went over her head.

134.    Ms. Corson engaged in protected activity under the MHRA, Title VII, and the WPA when she reported to Mr. Pagano what she believed in good faith to be unlawful sexist, racist, and threatening behavior on the part of Mr. Giampetro.

135.    Ms. Corson was emphatic about what a serious threat Mr. Giampetro posed to Modula's employees.

136.    Ms. Corson's motivation for having Mr. Giampetro investigated and for strongly recommending a severe sanction was to protect employees from being sexually and racially harassed and threatened at work and to address this danger to employees' safety.

137.    Mr. Pagano did not agree that Mr. Giampetro's conduct warranted termination.

138.    In fact, Mr. Pagano insisted that none of the allegations against Mr. Giampetro were true.

139.    Mr. Pagano claimed that he did not believe that Mr. Giampetro had violated Modula's policies or violated the law.

140.    Mr. Pagano denied that Mr. Giampetro's lewd comments and disrespect of women and minorities in the workplace was a problem.

141.    Mr. Pagano liked Mr. Giampetro and did not want to punish him or correct his behavior.

142.    Mr. Pagano reluctantly issued a warning to Mr. Giampetro for "disrespectful behavior" and "poor judgment" not for his racism, sexism, and threats of violence against others.

143.    Mr. Pagano exhibited animus toward Ms. Corson for engaging in protected activity on a continuing basis.

144.    Mr. Pagano called out Ms. Corson in front of her peers for continuing to bring complaints against Mr. Giampetro.

145.    Mr. Pagano gave Ms. Corson a lukewarm performance review and a very low raise.

146.    Mr. Pagano told Ms. Corson, "We're not friends."

147.    Mr. Pagano alternated between displaying open hostility and ignoring Ms. Corson.

148.    Significantly, Mr. Pagano repeatedly told Ms. Corson that he did not like the way she handled "the Joe thing."

149.    When he fired Ms. Corson, Mr. Pagano stated directly that the reason for termination was Ms. Corson's handling of the Joe thing, i.e. her opposition to Mr. Giampetro's sexism, racism, and workplace violence.

150.    Mr. Pagano said that Ms. Corson should have handled the matter in-house and not brought in outside counsel.

151.    Mr. Pagano had previously said that he did not think Mr. Giampetro's conduct warranted any discipline and that he was only doing what he was told was required by law.

152.    Defendant's after-the-fact reasons for firing Ms. Corson are untrue and pretextual.

153.    The real reason, stated by Mr. Pagano himself, is due to retaliation.

154.    Ms. Corson's sex and age factored into the decision to terminate her employment.

155.    Mr. Pagano did not take seriously the fact that Mr. Giampetro's conduct created a hostile work environment for women who worked at Modula.

156.    Mr. Pagano showed favoritism toward male managers like Mr. Miller and Mr. London, while disregarding and dismissing the concerns of Ms. Corson, a female manager.

157.    Mr. Pagano viewed Ms. Corson as "too emotional," which is a false sexist stereotype.

158.    Mr. Giampetro, a man, was not said to be "too emotional" when he could not control his temper, shouted at, and threatened employees.

159.    When Mr. Pagano looked for a replacement, he hired a younger, less experienced man instead of an older, experienced woman.

160.    Ms. Corson was not fired because she was a bad employee.

161.    Ms. Corson was fired because of her age, because of her sex, because of her opposition to sexual and racial harassment and discrimination in the workplace, and because of whistleblower retaliation.

162.    Defendant discharged Plaintiff and otherwise discriminated against her with respect to her compensation, terms, conditions, or privileges of employment, because of her sex.

163.    Defendant limited, segregated, or classified Plaintiff in a way that deprived or tended to deprive Plaintiff of employment opportunities or otherwise adversely affect her status as an employee, because of her sex.

164.    Defendant discharged Plaintiff and otherwise discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of her age.

165.    Defendant limited, segregated, or classified Plaintiff in a way which deprived or tended to deprive Plaintiff of employment opportunities or otherwise adversely affected her status as an employee, because of her age.

166.    Sex and age were motivating factors in Plaintiff's termination.

<u>COUNT I: MHRA</u>

167.    Paragraphs 1-166 are incorporated by reference.

168.    Defendant discriminated against Plaintiff on the basis of sex.

169.    Defendant discriminated against Plaintiff on the basis of age.

170.    Defendant retaliated against Plaintiff for opposing discrimination based on sex and race in employment.

<u>COUNT II: WPA</u>

171.    Paragraphs 1-170 are incorporated by reference.

172.    Defendant retaliated against Plaintiff because Plaintiff, acting in good faith, reported orally or in writing to the employer what Plaintiff had reasonable cause to believe were violations of the MHRA and Title VII and conditions that endangered the health and safety of employees.

## COUNT III: Title VII

173.    Paragraphs 1-172 are incorporated by reference.

174.    Defendant discriminated against Plaintiff on the basis of sex.

175.    Defendant retaliated against Plaintiff for opposing what she reasonably believed to be employment discrimination based on sex.

## COUNT III: ADEA

176.    Paragraphs 1-175 are incorporated by reference.

177.    Defendant discriminated against Plaintiff on the basis of age.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of her rights;

B.    Enjoin Defendant, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.      Award liquidated damages in an amount to be determined at trial;

I.      Award nominal damages;

J.      Award attorney's fees, including legal expenses, and costs;

K.      Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices which retaliate or discriminate on the basis of sex or age;

M.      Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

N.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the protections afforded by the MHRA, WPA, Title VII, and ADEA;

P.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of age, sex and retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  March 19, 2020                          /s/ Chad T. Hansen

                                                Attorney for the Plaintiff

                                                MAINE EMPLOYEE RIGHTS GROUP
                                                92 Exchange Street 2nd floor
                                                Portland, Maine 04101
                                                Tel. (207) 874-0905
                                                Fax (207) 874-0343
                                                chansen@maineemployeerights.com